## Case No. 14,070.

### TOBIN v. WALKINSHAW et al.

[1 McAll. 186.] [1]

Circuit Court, N. D. California.   July Term, 1856.

ALIENS—CITIZENSHIP—ACTS AND DECLARATIONS—INTERNATIONAL LAW — CEDED TERRITORY — TREATY — FOREIGNER NATURALIZED IN MEXICO BEFORE CESSION OF CALIFORNIA.

1. Acts and declarations of a party as to his intention in remaining in or removing from a country, though not simultaneous with his act, are, under special circumstances, admissible to prove the intention with which he acted, if made ante litem motam.

[Cited in Doyle v. Clark, Case No. 4,053.]

2. Where the intention or knowledge of a party becomes a material fact, acts and declarations, although collateral to the main subject, still, having a bearing upon it, are admissible as evidence.

3. By a principle of international law, on a transfer of territory by one nation to another, the political relations between the inhabitants of the ceded country and the former government are changed, and new ones arise between them and the new government.

[Cited in State v. Boyd, 31 Neb. 721, 48 N. W. 739, and 51 N. W. 602.]

4. The manner in which this is to be effected, is ordinarily the subject of treaty.

5. The contracting parties have the right to contract to transfer and to receive respectively the allegiance of all native-born citizens, but the naturalized citizens, who owe allegiance purely statutory, when released therefrom, are remitted to their original status.

This action was ejectment, and defendants pleaded to the jurisdiction of the court, on the ground that Alexander Forbes, one of the defendants, was not an alien and subject of Great Britain, as alleged in the complaint. Issue was taken by replication, and submitted to the jury, who returned a verdict in which they found that James Alexander Forbes, one of the defendants in this case, was, at the time of the institution of this suit, an alien and subject of Great Britain. A motion is now made to set aside the verdict of the jury, on the grounds,—
1. That testimony as to the acts and declarations of the party done and made ante litem motam, tending to show what country he elected to adopt, was improperly permitted to go to the jury.   2. That the verdict was contrary to the facts.

[For former proceedings, see Cases Nos. 14,068 and 14,069.]

Howard & Gould and E. W. F. Sloan, for complainant.

Peachy & Billings, for defendants.

McALLISTER, Circuit Judge. To sustain their plea, defendants relied on the admit-

[1] [Reported by Cutler McAllister, Esq.]

ted facts, that said Forbes, a native of Great Britain, was at the date of the treaty of Guadalupe Hidalgo a naturalized citizen of Mexico, that he has continued to reside in California since the execution of the treaty, and that he has never made any declaration of an intention to retain the rights of a Mexican citizen. These facts, it was contended, with the subsequent admission of California into the Union, fixed at once and by mere operation of law, the status of American citizenship upon the defendant Forbes. To disaffirm the plea, and sustain the allegation that defendant was an alien, plaintiff proved that in 1851 the defendant, against whom two actions at law had been instituted in the courts of this state, petitioned for their removal, and had them removed, from the state courts into the district court of the United States for the Northern district of the state of California (then exercising circuit-court powers), on the ground, that he was, at the time, an alien, and subject of the kingdom of Great Britain. That to accomplish that object, he executed bonds reciting that fact, and his attorney, under his instructions, swore to the fact. It was also in proof, that in the same year (1851), a suit was brought on the equity side of said district court; and to the bill filed the answer of defendant admitted that he was at that time an alien, and subject of Great Britain. Lastly, it was disposed by a witness whose testimony was not attempted to be impeached, that the defendant, in 1851, told him he was not a citizen of the United States, that he did not intend to become one at present, because he desired to be able to litigate in the courts of the United States. To the testimony sustaining the plea, objections were made by attorney for defendants, on the ground of incompetency, and were overruled by the court. This verdict is in the opinion of the court, fully sustained by the testimony given, and the only ground on which it can be set aside is, that the evidence was improperly admitted to go to the jury. In the view the court will hereafter take of this case, the question of the competency of the testimony might be dispensed with. But as it may not be inappropriate to allude to this testimony, the court will briefly advert to the objections made to its competency.

The argument of counsel is, that the provisions of the treaty of "Guadalupe Hidalgo," with the residence of defendant in California, being a naturalized citizen of Mexico, for a year after the date of that instrument; the fact that no evidence was produced to prove defendant ever made a declaration of his intention to retain the rights of a Mexican citizen, together with the admission of California into the Union, all fixed, once and forever, upon the defendant the status of an American citizen, which cannot be altered by the testimony. The consideration of this argument involves, to

some extent, a construction of the article of the treaty of Guadalupe Hidalgo, upon which it is predicated. This article stipulates as to those Mexicans who should prefer to remain in the ceded territory, that they may either retain the title and rights of Mexican citizens, or acquire those of American citizens; but declares that they shall be under the obligation to make their election, within one year from the date of the exchange of the ratification of the treaty, and those who shall remain after the expiration of that year, without having declared their intention to retain the character of Mexican citizens, shall be considered to have elected to become citizens of the United States. We will first consider this article as giving a right of election. If he elected to retain the character of a Mexican, he was to manifest it by a declaration, whether in writing, verbally, or by matter of record, is not stated. The treaty is more indefinite as to the manner in which he is to manifest a contrary intention. In fact, it prescribes no way in which he is to manifest his intent not to become a citizen of the United States. The omission to make a declaration to continue a Mexican, and his residence for a year after the date of the treaty, would be prima-facie evidence of his election to become a citizen of the United States. There is also one rule of evidence prescribed by the treaty as to his intention, the fact of his remaining in the country without having made any declaration of his intention. This cannot be deemed conclusive testimony, for election presupposes intention; it is an operation of the will. If the legal conclusion be absolutely fixed upon him in despite of the intent or the purpose of his residence, what becomes of the right of election?

In Inglis v. Sailors' Snug Harbor, 3 Pet. [28 U. S.] 123, the court say, "How, then, is his father, Charles Inglis, to be considered?—was he an American citizen? He was here at the time of the Declaration of Independence, and, prima facie, may be deemed to have become thereby an American citizen. But this prima-facie presumption may be rebutted; otherwise there is no force or meaning in the right of election." Considering, then, for the present, that the right of election had been clearly given to the defendant, the question is, not what do his feelings or interests now prompt him to do, but what did he do within the year his right of election existed. On one side, we have the prima-facie evidence prescribed by the treaty, his continued residence, and the fact that in the year 1851 he had voted at a corporation election. To counteract these, we have solemn legal instruments executed by defendant, describing himself as an alien and subject of Breat Britain. Availing himself of that allegation, he removed cases brought against him from the state to the federal courts, filing an answer

in a court of equity, in which he swore to the fact—his attorney, under his instructions, swearing to the same fact, and himself not only stating that he was not a citizen of the United States, but did not intend to be, as he wished to be able to litigate in the courts of the United States. To all these acts and declarations, it is urged, they are incompetent evidence, because done and said after the expiration of the time within which the right of election was to have been exercised. The general rule of evidence undoubtedly is, that acts and declarations not done and made simultaneously with the factum probandum, and not forming part of the res gestæ are inadmissible. Yet if an alleged fact cannot exist together with other facts, the proof of the latter facts disproves the existence of the former. If the declarations and acts of Forbes in 1851 were established, they would necessarily disprove the alleged fact that he had previously elected to become a citizen of the United States. They were, therefore, to be left to the jury. It is settled, that the declarations and acts of a party are admissible to qualify and explain his intention in removing, or the character of his residence, in a question of domicil. And it is to be borne in mind that we are considering the admissibility of this testimony in view of a construction of the treaty, which gives to a party a right to elect whether he will retain the title and rights of a Mexican, or take those of a citizen of the United States. To exercise this right, there was no necessity, under the treaty, that there should have been an actual removal, nor is such actual removal the only evidence that the right of election has been exercised. In the case of Inglis v. Sailors' Snug Harbor. 3 Pet. [28 U. S.] 123, the court say, "It surely cannot be said that nothing short of actually removing from the country before the Declaration of Independence will be received as evidence of election." And the court proceeds to consider the acts of the party, adduced as evidence to qualify and characterize the remaining in the country. Now, inasmuch as other acts beside that of removal may be received as evidence of the manner in which the right of election was exercised, the court considers the testimony competent. In the case at bar, defendant remained in this country, and, with a view to ascertain his intention in remaining, his acts and declarations, though made subsequently to the time, were left to the jury to find in what manner he had elected.

But there is another aspect in which the testimony may be received. It constitutes by reason of its character an exception to the general rule, that declarations and acts not forming a part of the res gestæ are inadmissible. That exception applies to cases where the intention of a party becomes material, in which cases facts evidencing the intention, although collateral and foreign

to the main subject, still, as having a bearing upon the question of intent, are admissible. In Wood v. U. S., 16 Pet. [41 U. S.] 360, it is said, in questions "where the intent of the party is matter in issue, it has always been deemed allowable, as well in criminal as in civil cases, to introduce evidence of other acts and doings of the party, of a kindred character, in order to illustrate or establish his intent or motive in the particular act directly in judgment." Now, if the right of election was awarded to the defendant, and it was not the intention by the rule of evidence the treaty creates, to force upon the party who remained in the country American citizenship contrary to his intent (which we think is not the case), then the intent of the party in remaining becomes a material question; and matter en pais—such as the acts and declarations of the party—although not forming a part of the res gestæ, are admissible so far as they serve to show the intent. In the Inglis Case, hereinbefore cited, the court went into the consideration of the acts and doings of the party for a series of years, to ascertain what election he had made at a particular time anterior to them; and say, "Those lead to the conclusion that it was the fixed determination of the party, at the Declaration of Independence, to adhere to his native allegiance." In fact, intent is best known to the party, is often secret until developed by acts and speech. "Acta exteriora indicunt interiora secreta." Lastly, this testimony is admissible as admissions made by a party through his declarations and acts spoken and done ante litem motam, and opposed to the right he now seeks to maintain.

But the court does not consider that the right of election was given to the defendant by the treaty of Guadalupe Hidalgo; and therefore the discussion as to the admissibility of testimony might have been dispensed with. The intention of the 9th article of that instrument was to fix the status of all Mexicans who should prefer to remain in the ceded territory. By a principle of international law, on a transfer of territory by one nation to another, the relations of the inhabitants towards each other undergo no change; but their relations with their former sovereign are dissolved and new ones between them and the government which has acquired their territory are created. The same act which transferred their territory, transfers the allegiance of those who remain in it, and the law which may be denominated political is changed. American Ins. Co. v. Canter, 1 Pet. [26 U. S.] 542. This right to change the political relations of the inhabitants of a ceded territory arises out of the character of those relations as recognized by the law of nature and nations. Birth binds man by the tie of natural allegiance to his native soil, and such allegiance gives, by the principles of universal law, to the country in which he was born

rights unknown to mere voluntary or statutory allegiance. Upon the right to transfer this natural allegiance has been engrafted, this right of election in the party whether he will retain his allegiance to his old sovereign, or pay allegiance to the new. Should he elect to retain his allegiance, he must do so without injury to the new government; and such election is generally accompanied by removal from the country, unless regulated by treaty. The object of the treaty of "Guadalupe Hidalgo" was to regulate the exercise of this right of election by such parties as by the principles of international law were subject to their jurisdiction as contracting parties. The Mexican government stipulated for a right for Mexicans resident in the territory, to elect at any time within a year after the date of the treaty to retain their title and rights as Mexicans; the government of the United States guarded against the abuse of the right, by limiting the time within which it was to be executed, and stipulating that if the election was not made within the time limited, they should be considered as having elected to become citizens of the United States. The right of the two governments thus to stipulate in relation to native-born Mexicans, under the law of nations, is unquestionable. It was evidently proper that the status of all such should be fixed. If they were neither to continue Mexican citizens nor become citizens of the United States, a whole people would become disfranchised. They would have no status as citizens, owe no allegiance, and be left in the anomalous position of a people without a country. Not so with the defendant Forbes. So soon as he had been released from the voluntary allegiance to Mexico, he was remitted to his original status. No power existed in one government to transfer, or in the other to receive, the voluntary or statutory allegiance of a naturalized citizen. Neither had the right to say to such, "You shall continue your allegiance to Mexico, although she has conveyed it away; or you shall become a citizen of the United States." The allegiance of the naturalized citizen is the offspring of municipal law. Unlike natural allegiance, its support does not rest upon the law of nature and the code of nations. The only relations that Mexico or the United States could change, were those arising from those sources. Nor does the language of the treaty authorize the conclusion that the contracting parties intended to include within the word "Mexicans" naturalized citizens of foreign countries. The language of the treaty of Guadalupe Hidalgo, differs materially from that used in the treaty by which Florida was acquired in 1819, and the treaty of Paris, in 1803, by which Louisiana was ceded to the United States. In the 8th article of the treaty of Guadalupe Hidalgo, Mexicans are only mentioned as entitled to the rights of election. The whole of this arti-

cle refers to Mexicans; and the 9th article speaks of "Mexicans" only, and provides, that those who do not preserve the character of Mexican citizens shall be subsequently incorporated into, and become entitled to all the rights of citizens of the United States. Naturalized citizens are nowhere included eo nomine, within the provisions of the treaty; and in the opinion of the court, it was not intended to include them. This construction of the treaty is sought to be defeated by the assumption, that the change in the political relations of the inhabitants of the ceded territory was contemplated to be made by the treaty with their consent by giving to them the right of election; hence, that it is to be reasonably concluded that naturalized citizens were intended to be included in the term "Mexicans." The answer is, first. it is a violence to the language of the treaty so to construe it; secondly, the allegiance of the naturalized citizen was not a subject of transfer between the contracting parties; and thirdly, the argument surrenders the whole question: because if the defendant was included in the treaty. his consent was essential to entitle him to exercise the right of election. This is the very question found by the jury on the trial of the issue of election or no election, upon evidence the court considers competent on the trial of such an issue. In a word. if the defendant Forbes. a naturalized citizen of Mexico, is to be brought within the provisions of the treaty because he consented to them, then his consent, involving intention and election, is an issuable fact which has been found against defendants by the jury. But in the opinion of the court, the election was given only to Mexicans who remained in the ceded territory longer than one year after the date of the treaty, who were during that interval to select to retain Mexican rights, or be considered citizens of the United States. Both governments had the right so to negotiate in regard to Mexicans; but in relation to the defendant Forbes, a naturalized citizen. his voluntary allegiance might be released by Mexico—not transferred. On his release. he was remitted to his original status of a British subject, derived from his birth; and the courts know no principle of law which would authorize the government of the United States to compel the transfer of the defendant's voluntary allegiance from Mexico to themselves. The contracting parties did not intend to do so. The court considering the defendant without the provisions of the treaty, his claim to be a citizen of the United States under them cannot be sustained; and he stood at the execution of the treaty. and now stands. where his acts and declarations and original status have placed him— an alien, and subject of Great Britain.

The motion to set aside the verdict in this case, must be overruled.